EDOK - Application for Search Warrant (Revised 5/13)

# United States District Court
## EASTERN DISTRICT OF OKLAHOMA

| In the matter of the search of: | |
|---|---|
| One LG Brand Cell Phone SN: 101HUYN0467794, Currently Located at the FBI Office in Muskogee, Oklahoma | Case No. 21-MJ-307-SPS |

## APPLICATION FOR SEARCH WARRANT

I, Special Agent Adam Reynolds, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the **EASTERN** District of **OKLAHOMA** *(identify the person or describe property to be searched and give its location)*:

   **SEE ATTACHMENT "A"**

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

   **SEE ATTACHMENT "B"**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

   ☒ evidence of a crime;
   ☐ contraband, fruits of crime, or other items illegally possessed;
   ☐ property designed for use, intended for use, or used in committing a crime;
   ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of Title 18, United States Code, Section(s) 1111, 1151 and 1152, and the application is based on these facts:

   ☒ Continued on the attached sheet.
   ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*[Signature]*
Adam Reynolds
Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my presence.

Date:   July 8, 2021

*[Signature]*
*Judge's signature*

STEVEN P. SHREDER
UNITED STATES MAGISTRATE JUDGE
*Printed name and title*

City and state:   Muskogee, Oklahoma



**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Adam Reynolds, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I make this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device (the "Target Device") —which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.  As a Federal Law Enforcement Officer, I am authorized to execute warrants issued under the authority of the United States. I am a Special Agent with the Federal Bureau of Investigation (FBI), I have been so employed since August 2009 and I am currently assigned to the FBI Oklahoma City Division, Muskogee Resident Agency. I am presently assigned to work primarily Indian Country criminal investigations in the Eastern District of Oklahoma. During my career as an FBI Agent, I have investigated numerous Indian Country crimes to include a variety of violent crimes. Moreover, I am a federal law enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C. § 1151, 1152, 1153, 1111 and 81 am authorized by the Attorney General to request a search warrant.

3.  I am familiar with the facts and circumstances of this investigation. The facts set forth in this Affidavit are based on events that transpired in the Eastern District of Oklahoma, in Indian Country, and are based on my personal observations, knowledge obtained from other law enforcement officers, my review of documents related to this investigation, conversations with others who have personal knowledge of the events and circumstances described herein, and a review of open source information including information available on the Internet. Since this

affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact I or others have learned during the course of this investigation.

4. Based on my training and experience and the facts as set forth in this Affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 1111, 81, 1151, and 1152, have been committed by BERNARD POULIN. There is also probable cause to search the item described in Attachment A for evidence of these crimes further described in Attachment B.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5. The property to be searched is an **LG Brand cell phone SN: 101HUYN0467794**, hereinafter the "Target Device." The Target Device is currently located at the FBI Office in Muskogee Oklahoma, 120 S Edmond Place, Muskogee, Oklahoma which is in the Eastern District of Oklahoma.

6. The requested warrant would authorize the forensic examination of the Target Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

7. As will be shown below, there is probable cause to believe the victim, Nicolas Don Shaver ("SHAVER"), an enrolled member by blood of the Cherokee Nation, was murdered at his home, by BERNARD POULIN, in violation of Title 18, United States Code, Sections 1111, 1151 and 1152.

8. VENUE: the facts and circumstances alleged in this affidavit occurred within the Eastern District of Oklahoma. More specifically, based on the Supreme Court decision in *McGirt*

*v. Oklahoma (2020)*, the below described location is within the geographic boundaries of the Muscogee (Creek) Nation Reservation, and therefore is within Indian Country.

9. DEFENDANT: the defendant is BERNARD RICHARD POULIN ("POULIN"), date of birth September 21, 1991, and is not a known member of a Federally Recognized Tribe.

10. I received information regarding a crime which occurred in Okmulgee County, Oklahoma within the boundaries of the Muscogee (Creek) Nation Reservation. This Affidavit is made in support of a Search Warrant for a violation of Title 18, United States Code, Sections 1111, 1151 and 1152. In support of this request, I submit the following:

11. On May 12, 2021, Beggs Police Department responded to a residence located at 801 W. Main St., Beggs, Oklahoma, after being notified by three individuals that a person was deceased inside. The reporting parties stated that J.S. was with the person who stabbed the victim, SHAVER. Upon arrival, responding officers observed what appeared to be forced entry into the residence. During a cursory safety search of the residence, responding officers located SHAVER deceased on the floor, with a large laceration to his neck. Additionally, shoe prints were observed in the pool of blood next to the victim. It should be noted, SHAVER was wearing socks when found by responding officers.

12. On May 12, 2021 and extending into the morning of May 13, 2021 a Federal Search Warrant was executed at 801 W. Main St., Beggs, Oklahoma. During the execution of the search warrant, the following observations were made by Affiant. The victim SHAVER had multiple injuries/lacerations to his head and body. Some injuries appeared to possibly be stab wounds and other injuries appeared to be blunt force trauma. Next to the victim's body was an approximately 2-foot long wooden club/stick which had blood on it. There was a large knife sitting on a table near the body. Affiant did not witness any visible signs of blood on the knife. Bloody shoe prints

and a bloody handprint were also located near the body on the floor. Also on the floor near SHAVER's body was an **LG Brand cell phone SN: 101HUYN0467794**. The crime scene was photographed and worked by FBI Task Force Officer Janelle Daggett from the Oklahoma State Bureau of Investigation.

13.     On or about May 12, 2021, Task Force Officers Robert Frost, Andy Blizzard and Muscogee Nation Investigator Leonard Lovins interviewed K.S., the stepmother of J.S. K.S. stated that on the evening of Monday, May 10, 2021, J.S. came to the back door of her residence, fell on the floor, and while breathing heavily, said he needed a drink. J.S. stated to K.S. he didn't do it, that tattoo face did it. K.S. then asked J.S., "did what," and J.S. said, "stabbed him." K.S. also that stated on Monday, May 10, 2021, J.S. had told her that he and the victim, SHAVER, were fighting and the other guy stabbed SHAVER.

14.     On or about May 12, 2021, FBI Task Force Officer Andy Blizzard, FBI Agent Joe Dick and FBI Task Force Officer Robert Frost talked with J.S. at 11603 North 264th Street in Okmulgee County, Oklahoma. After being provided an Advice of Rights form, J.S. agreed to waive his rights both verbally and with signed consent form, and provided the following information:

15.     J.S. went to SHAVER's house to talk to him about SHAVER talking to his girlfriend. Along the way, he ran into "B," identified as BERNARD POULIN. J.S. told POULIN where he was going, and POULIN went with him. J.S. said he knocked on the side door of the victim's house and SHAVER told him to come to the front door. J.S. said he and POULIN went into the house and they drank beer. J.S. stated he did not drink a full beer.

16. SHAVER and J.S. began to talk about a girl, and it became heated. SHAVER and J.S. began to fight, during which POULIN started hitting SHAVER with a wooden object that looked like a bed post.

17. J.S. stated SHAVER had his back towards POULIN when POULIN made a stabbing motion towards SHAVER's back. SHAVER grabbed his back in the area of where POULIN had struck him. J.S. stated he did not see POULIN holding a knife at that time. J.S. later stated that POULIN stabbed SHAVER in the chest and the back.

18. J.S. stated SHAVER fell to the floor and he saw blood starting to run towards the door. J.S. stated SHAVER was on the floor and POULIN was standing over SHAVER and was still striking him. POULIN also kicked SHAVER in the head area three to four times.

19. J.S. became scared and ran away from SHAVER's house and went to his Dad's house. When J.S. left SHAVER's house, he had to yank on the front door for it to open. J.S. stated that when he left the residence there was a Camaro and a White Expedition in the yard. J.S. stated he did not intend for this to happen to SHAVER and he didn't deserve what happened.

20. On May 13, 2021, FBI TFO Kevin Branscum and TFO Duston Todd interviewed POULIN. After being provided an Advice of Rights form, POULIN agreed to waive his rights both verbally and with a signed consent form, and provided the following information:

21. TFO Branscum asked POULIN why he thought law enforcement was talking to him today which he responded that some people think that he hurt someone and killed them. POULIN stated that he knew we were talking about SHAVER and stated that he normally does not go over to his house, but the last time was a few days ago, Sunday or Monday, when he went to buy some "speed." He stated that previously SHAVER disrespected and "fucked over" a friend of his and POULIN had it "on his mind to beat his ass" before going over there. He stated that he

and J.S. got a ride from J.S.'s girlfriend. Upon arrival at SHAVER's residence, POULIN stated that he knocked on the door and soon thereafter entered to see that SHAVER was the only one there. Once inside, POULIN stated that SHAVER started being "mouthy" and lied to him three different times. Because of this, POULIN stated that he then "beat the shit out of the motherfucker."

22.     POULIN stated that at the beginning of the altercation, he picked up a wooden stick, he described it as possibly the leg of a table, which he then swung at SHAVER's head. After this, POULIN stated that he then began using his fists, elbows and legs to hit him. I asked him if SHAVER hit him and he replied, "he tried." At the end, POULIN stated that SHAVER was laying on the ground and was hurt. When asked, POULIN stated that he was hurt on his head, side and back saying that he was bleeding and "lumped up" because he hit him all over. POULIN stated that before he left, while SHAVER was laying on the ground with his hand up as if telling him to stop, he kicked him in the face 3 or 4 times. POULIN stated that at the end, SHAVER was still breathing, and did not know what happened after he left, but that he did not "give a fuck about that weirdo." During this altercation, POULIN stated that J.S. was initially inside the residence, but left sometime during the fight.

23.     TFO Branscum asked POULIN if either one of them was armed with a weapon. POULIN stated that SHAVER had a "skinning knife" and that POULIN always had his knife with him. POULIN described his knife as a fixed blade "field dressing knife" which was approximately 8-10 inches long as illustrated with his hands. Poulin asked if he still had the knife which he stated no. POULIN stated that this knife he carried broke sometime after the altercation with SHAVER and he threw it in a fire at his friend B.H.'s residence. When asked if POULIN stabbed SHAVER, POULIN stated he did not stab him.

24. When asked, POULIN stated that he was unaware of anyone else that was physically fighting with SHAVER on the night he got into an altercation with him. After the altercation, POULIN stated that he then took SHAVER's white SUV parked outside the residence because he didn't feel like walking. When asked if SHAVER commonly let him borrow his vehicle in the past he replied "fuck no." POULIN stated that he drove the SUV near B.H.'s house where he parked it in a field behind a tree where it could not be seen from the road. POULIN stated he did this so he would not be caught with a stolen vehicle, as he already had one of those charges. POULIN was asked if it was still parked behind the tree which he stated no. POULIN was then asked if he had been driving the vehicle today, which he stated yes. When asked what he did with the vehicle, he stated that he set it on fire and pushed it down a hill.

25. While speaking with POULIN, TFO Branscum observed injuries on his arms, hands/knuckles and legs which were consistent with being in an altercation. The injuries were photographed.

26. POULIN further indicated during his statement that he had previously purchased narcotics from SHAVER, and on May 10, 2021, he had attempted to purchase methamphetamine from SHAVER. At the time of POULIN's arrest, he was found to be in possession of approximately 45 grams of methamphetamine.

27. It is well known that narcotics distributors utilize cellular phones in the course of completing narcotics transactions. There is probable cause to believe that the **LG Brand cell phone SN: 101HUYN0467794** belonged to the victim, SHAVER, and will contain evidence of text messages, Facebook messages, calls, internet history, Google location history, other location information and/or emails that could provide evidence related to previous narcotics transactions between SHAVER and POULIN, including conversations had between the parties on May 10,

2021 leading up to SHAVER's murder. It is further believed that this information will assist in establishing a timeline of events and demonstrate motive and intent to commit the charged crimes. Moreover, the existence of photos or videos on the cell phone created contemporaneous to the murder may also assist in the investigation.

## TECHNICAL TERMS

28. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of

        four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    c.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

29.    Based on my training, experience, and research, I know that the Target Device has capabilities that allow it to serve as a wireless telephone. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

30.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools.

31.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Target

Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Target Device because:

 a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

 b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

 c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

 d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

 e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

  f. I know that when an individual uses an electronic device to make electronic and/or telephonic threats, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

32. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

33. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

34. *Methods of examination.* In conducting this examination, law enforcement personnel may use various methods to locate evidence and instrumentalities of the Subject Offense, including but not limited to undertaking a cursory inspection of all information within the Target Device. This method is analogous to cursorily inspecting all the files in a file cabinet in

an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with e-mails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account as it is impossible to know in advance all of the unique words or phrases investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but do not contain any keywords that an agent is likely searching for.

## **CONCLUSION**

35.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Target Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

_____
Adam Reynolds, Special Agent
Federal Bureau of Investigation

Telephonically subscribed and sworn to before me on: July 8, 2021

_____
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

The property to be searched is a **LG Brand cell phone SN: 101HUYN0467794**, hereinafter the "Target Device." The Target Device is currently located at the FBI Office in Muskogee, Oklahoma, Located at 120 S Edmond Place, Muskogee, Oklahoma. This warrant authorizes the forensic examination of the Target Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.  All records on the Target Device described in Attachment A that relate to violations of Title 18, United States Code, Section 1151, 1153, 1111 and 81 including:

    a. Evidence of user attribution showing who used or owned the Target Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, saved usernames and passwords, documents, and browsing history;

    b. Records and information relating to geolocation and travel in furtherance of the Subject Offense;

    c. Records relating to communication with others as to the criminal offense above; including incoming and outgoing voice messages; text messages; multimedia messages; Facebook messages, applications that serve to allow parties to communicate; all call logs; secondary phone number accounts, including those derived from Skype, Line 2, Google Voice, and other applications that can assign roaming phone numbers; and other Internet-based communication media;

    d. Threatening communications related to the Subject Offense;

    e. Records relating to documentation or memorialization of the criminal offense above, including voice memos, photographs, videos, and other audio and video media, and all EXIF information and metadata attached thereto including device information, geotagging information, and information of the relevant dates to the media;

    f. Records relating to the planning and execution of the criminal offense above, including Internet activity, including firewall logs, caches, browser history, and

      cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, records of user-typed web addresses, account information, settings, and saved usage information;

  g. Application data relating to the Subject Offense;

  h. All records and information related to the coordination, agreement, collaboration, and concerted effort of and with others to violate the Subject Offense

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.